13-1283, Dalton Trucking, Inc. v. Environmental Protection Agency Gina McCarthy and her official capacity as Administrator of the United States Environmental Protection Agency Mr. Hatziantich for the Petitioners, Mr. Levin for the Respondent, and Mr. Hirsch for the Intervener Thank you. Good morning. Theodore Hatziantich for the Petitioners. I reserve two minutes for rebuttal. May it please this Court. The threshold issue is venue. And all parties agree that the determination of whether any particular action by EPA under the Clean Air Act is of national applicability on the one hand or only of regional and local applicability on the other hand hinges on the face of the regulatory action itself. Here, EPA made a decision to allow California to enforce its emission standards in the state of California. As the face of the waiver grant states on page 58-121 of the Federal Register Notice, the only decision taken by EPA in the authorization proceeding is the decision that permits the state of California to adopt and enforce its state regulations. If that is the only decision taken by the state of California, that decision only by EPA, that decision applies only in California. Consequently, it is of local or regional applicability and venue is appropriate in the Ninth Circuit. Now, during the waiver process, EPA had the opportunity to try to bring the venue into this court, into the D.C. Circuit. Had it made a finding that this locally or regionally applicable decision actually has nationwide scope and effect. But EPA didn't make that finding here. EPA made a finding of national applicability. And that finding is belied by the face of the waiver grant, the language of which I just read. Consequently, this court should transfer the case to the Ninth Circuit, which has the appropriate venue here. If this court decides on the merits, the issue is relatively straightforward. It has to do with the scope and the content of the needs test. The operative language is the term such California standards. Now, for the better part of three decades, this court and the Supreme Court has determined that the term standards under the Clean Air Act is a term of art meaning quantitative emission levels. And as Justice Scalia once observed, under the Clean Air Act, a standard is a standard and not something else. So the term in the act means such California quantitative emission levels and not the California program as a whole. Now, why is the term standards set forth in the plural as opposed to the singular? Well, as this court has observed, from time to time, California is required to apply for waivers from federal preemption whenever it wishes to enforce a new set of California mobile source emission standards. And so, consequently, from time to time when EPA receives a waiver application, it must determine whether California has a compelling and extraordinary need for the standards set forth in the waiver application. And I think it's important to note that the waiver applications themselves usually do not include only one quantitative emission limit, but there are several quantitative emission limits. In other words, several standards for each waiver application. And this case is no example here. Are you saying that your position is that each state standard, is that basically what you're saying? That the second use of such California standards means each such California standard? Yes. Is that the meaning that you're attributing to the little double I? Yes, Your Honor, it is. So why didn't Congress use the words each such California standard or each California standard? Because, Your Honor, from time to time, EPA is required to determine whether California needs the standards embedded in the waiver application. That's fine, but why didn't they say each each? Well, because waiver applications generally have more than one quantitative standard. A waiver application such as this one contains standards for nitrogen oxides on the one hand. Why didn't they say each standard in the waiver application? That is what they said in 1977. They said in 1977 they used if each state standard. This is what they're talking about as at least astringent. And that's cited on page 49 of your brief. So it's clear Congress knew how to say what you want to say, but they didn't say that. And then they also used the words in the aggregate. Well, Your Honor, the term in the aggregate modifies the protectiveness test, but it does not modify the separate and distinct needs test. How do we know that? It says it uses the words such standards in double I, which seems to be a reference back to the modified standards, the standards which have been modified by the aggregate in A. I don't believe so, Your Honor. The term in the aggregate modifies the immediately following noun or phrase. That's wrong. You're using the doctrine of the prior antecedent, right? Yes, Your Honor. Well, you have it actually backwards. That doctrine says, I'm reading to you from the Barnhart case, should ordinarily be read as modifying only the noun or phrase that it immediately follows. Not that immediately follows it, but that it immediately follows. That's the standard rule. And the phrase that it immediately follows is California standards. If we follow the rule that you're asking us to follow, we have to rule against you. Your Honor, I don't believe that that's entirely accurate. That particular case may say that, but the general rule for a statutory modifier is that it modifies the immediately preceding or succeeding noun or phrase. That is an absolute rule, isn't it? This is all contextual. That's a guide or a norm, but it's not an absolute rule. And what standard are we supposed to be applying to this interpretation? I think the standard that should be applied here is the plain meaning of the language used. Had Congress intended that the term such California standards mean the entire program that California has, it could have… Is there any construction of this language that is entitled to deference? I don't believe that there is, Your Honor, because the plain meaning of the language used standards refers to quantitative emission limitations. And there's nothing in the statute that indicates that where there are quantitative emission limitations, EPA should determine whether the entire program is necessary. What if we thought the use of the plural standards and the use of the phrase in the aggregate rendered the section ambiguous? Then what would we do? If Your Honors came to that conclusion, then the briefing has an extensive analysis of the legislative history, which should be reviewed for ambiguous statutory analysis. There's this word, this one word we always use here, Chevron. Are you telling me that Chevron doesn't apply to the interpretation here? Chevron would apply only if the EPA's analysis was consistent with the intent of Congress. And here, the legislative history shows, we have probably 15 pages devoted in the opening brief to the legislative history, shows that Congress did not intend for the term such California standards… Or we think it's ambiguous, which is just as good. Isn't it up to EPA at that point to decide what weight they want to give legislative history, which is inherently not the law? I don't believe that's true, Your Honor, under the most recent Supreme… You know, counsel, you keep telling us what you believe. Yes. We would like to know what the law is on these things. Yes, Your Honor. Any number of times already you've told us what you believe. And if EPA wanted to set legislative history entirely aside, that would be entirely consistent with what the legislative history says. No, that's not true, Your Honor, especially in light… You mean all these years I haven't been setting it entirely aside? Especially in light of the 2015 decisions by the U.S. Supreme Court in King v. Burwell and Michigan v. EPA, where clearly the Supreme Court stated that if the agency's interpretation is inconsistent with the statutory intent… Right. …then it cannot stand. Statutory intent in the first instance is taken from the language of the statute, right? Yes. But the very existence of Chevron presumes that there are ambiguities that are not resolved by the clear language of the statute. Now, there is language in the cases applying Chevron that says to use the ordinary tool of the statutory construction, but that doesn't compel any particular piecing out of legislative history in the way that you want it. Aren't you stuck with a differential standard if we get to the point of drawing a statute? No, we're not, Your Honor, because under those two Supreme Court cases, where there is ambiguity, the key is what is the legislative intent? And if it's demonstrably shown, according to the legislative history, that the legislative intent is contrary to the interpretation of the government, then under those two recent Supreme Court cases, no deference should be given to the government interpretation. Which page in your brief has the best legislative history that you're relying on? Your Honor, just one moment, please. Okay. We discuss the legislative history extensively on pages 45 through 53 of the opening brief. And which sentence would you like to read to me that establishes that it unambiguously means that we only look at each individual standard? Your Honor, I'm not sure if I can call out one particular sentence, but what these dozen or so pages do is trace the history of the Act, of Section 209, from 1967. I've read the pages. What I'm missing is any sentence in the legislative history that says that a statute means that you have to evaluate standard by standard and that we don't mean to use the words in the aggregate to apply to the whole program for the second double I, such standard. That's what I couldn't find. Is there something like that? Yes, Your Honor. I'm sorry, I'm not able to pinpoint one specific sentence. I'll give you two or three. It's okay. But I need something. We need to overcome the ambiguity of the language of the statute. We need awfully clear legislative history, so clear that no other reading would be permissible. That's what Chevron tells us. So I'm looking for something that would make the EPA's reading impermissible. I think the EPA's reading is impermissible because of the high bar set for the needs test. There has to be a compelling and extraordinary need for the California standards for which we are referring. Now you're referring to the language of the statute, not to the legislative history, right? Yes, Your Honor. Okay. Can I ask you about ARPBA? How do you pronounce it, ARPBA? ARPTA. Okay. About standing, the question I have is our case, Chamber of Commerce, and the Supreme Court's case, Summers, that requires the naming of a member of an association and then proof that that member has standing. Now I'm right, am I not, that no member has been named in the affidavits as being injured. Is that right? Your Honor, with regard to the ARPTA-specific issues that were raised, I've been instructed by ARPTA counsel that on those issues I'm not authorized to speak for ARPTA, even though the time has been ceded to me. So we're just... ARPTA stands on the briefing with regard to those issues. Okay, fair enough. Now, Your Honors, I see that I have one minute left, and I would like to reserve that one minute for rebuttal. Thank you. All right, thank you. Good morning, Your Honors. You may please record. My name is Joshua Levin on behalf of the U.S. EPA. I'm joined today by my EPA counsel, Winifred Okoye, and by California counsel, Rosh Hearst. This is an unusual case, Your Honors. As the Court's already noted, petitioners chose to sue EPA in this court to challenge EPA's waiver decision, but they've gone to great lengths, extraordinary lengths, to suggest that the Court lacks venue over their case. It is rather strange, but perhaps since the issue has been raised, do you want to tell us why we do have venue in the face of the challenge? Yes, Your Honor. I'm going to say it certainly strikes me as odd that somebody would bring an action and then challenge the venue before they brought it in. Well, I take it as protective. That seems pretty... Yes, we acknowledge that. They don't know how we're going to rule. We certainly acknowledge that and have not challenged it. In any event, why do we have venue here? The EPA has identified two separate and equally strong bases for venue. The principle and threshold one is the national applicability of its decision, not because it said so in its rule, but because the workings of Section 7543E of the AIR Act and the opt-in provision provide that national applicability inherently. Other states can adopt this regulation once it's approved, and EPA has no further opportunity to review it. It does turn out that this is a California local applicability, the rule that we're dealing with now, right? This rule, by its terms... So why do we have venue here as opposed to United States? Judge Santel, the fact that this may become the national norm for other states, non-rural... It may, it may not. It may or may not, but... It does. But right now it's not. Right now we're dealing with a California statute. That's true. And I'm having a very hard time seeing why we have it. Well, it's important to stress, Your Honor, that unlike California, which has the authority expressly in 7543E, EPA does not have corresponding statutory authority to enact its own rules for in-use non-road vehicles. California is the only jurisdiction in the country that has that authority. Well, that's pretty local when it's the only jurisdiction in the country that has it. Well, nonetheless, these rules can be adopted elsewhere without any further EPA review, and we believe that the statute, for that reason, makes these nationally applicable actions. But they're not applicable now, right? I mean, even if we upheld California, they wouldn't be nationally applicable, would they? Each state has to opt in, right? Each state has to opt in and has not yet done so. So at this moment, it's not really nationally applicable. Is that fair to say? It's fair to say that this is the correct court to review regulations with national impact. Well, national impact. Now we're on the third sentence, right? We'll get to that in a moment, but we're on the applicable. Isn't the difference between nationally applicable and, I'm just trying to get the words here, scope and effect, that difference between impact and applicability? The court has recognized that there's a somewhat elusive and imprecise distinction between those two concepts. Well, one uses the word applicable and one uses scope and effect. So it does sound like the first one has sort of a legal question, does it apply, and the second is an impact, scope and effect. On the applicable one, you said it's nationally applicable. In the history of the California waiver, how many states have ever adopted the California waiver? My understanding, Your Honor, and I think the court counsel can address it more directly, my understanding is with regard to the non-road provision, there's been upwards of 30 over the course of You mean road provisions? Road provisions upwards of 50. 50 states have adopted? Excuse me, I'm sorry, the number of waiver decisions. The website, the best I could find on the EPA website is that as of 2007, only 15 states had adopted the on-road emission standards under the waiver provision. Is there a higher number that I should be looking for in the number of states that have adopted? Yes, I won't be able to give you that, Your Honor. But I will stress that states need not adopt the entire program promulgated by California. Do you have any idea whether even the majority of the states have adopted California standards, any particular California standard? I don't, Your Honor. I know that the litigation has focused on the low emissions vehicles challenges that have been raised in the First and Second Circuits, and we have briefed those issues, New York State, Massachusetts, perhaps Vermont as well. So it's been adopted in certain parts of the country. I don't know at this time. I'm happy to provide the court with information on the number of states. But getting to the court's point about the national applicability of this decision, separate and apart from the opt-in provision, which we think is the most important provision for the court to focus on, the regulation by its terms does govern out-of-state fleets that operate in California. If they operate in California. Yes. I don't see how that states is anything but the law. If they operate in one state, they're covered. If they operate in any of the other 49, presumably they're not covered. How can that be a national applicability? If a business is in the practice of providing off-road vehicles to California and it knows that it's going to continue to do so and it happens to be in a state far afield from the Ninth Circuit, these regulations will govern what it does to those vehicles. You're talking about what the chief judge suggested. You're talking about impact, which, if it's anything, is scope and effect and not applicability. Yes. Don't you want to leave applicability? You said you had more than one basis. You're not doing real good on this one. Do you want to try the other one? We've identified both those elements as grounds for the national applicability. Where's the finding on determination of nationwide scope or effect? What EPA issued was a determination of national applicability. We acknowledge that those are the words that were used. Our point to the court, respectfully, is that it's Congress's intent to honor the plain intentions of EPA in its determination. Did EPA say anything else with regard to that purported determination to suggest that they misspoke in the determination? No, Your Honor. What EPA did here is use a phrase that is used historically, frequently, including in cases that have come before this court in which this court has affirmed. Why didn't it use the phrase that's used in the statute? Your Honor, it's a fair question. I understand that each— It's astounding, isn't it? It's a fair question. I think that what EPA would say and what I say in its defense is that there are vagaries of what were the line that was drawn. But the statute specifically says if such action is based on a determination of nationwide scope or an effect and if in taking such action the administrator finds and publishes that such action is based on such a determination. I mean, is this like somebody in the EPA misread the statute and used the first sentence rather than the third sentence? It's probably the case that old habits have died hard and EPA had not been challenged previously on the phraseology used in businesses. They didn't have a copy of the statute, did they not? Your Honor, I'm not here to say that the language of the statute was observed to the letter. I am asking the court to recognize what EPA's intent was. Well, nobody's talking about what to the letter or not to the letter. They did not make the language in the statute, the finding within the statutory language, did they? They made a determination of nationwide— That's a yes or no. That's a yes or no. There's language in the statute about scope and effect. That finding would have been titled under this venue. Yes, sir. They didn't make that finding, did they? Did they cite three, subparagraph three? Your Honor, I don't know that for sure. I think the record would be clear on that point. And I will acknowledge that if the court decides to focus on the need for literalism in that language, then— We call that following the law. It isn't literalism. It isn't metaphysical. The two terms are different. And you can't convince us, I don't think, that they aren't different. They are different in what they say. Yes, Your Honor, they are. To make the determination you want, you have to pick the correct term. And they didn't, which is quite astonishing. I'm wondering, did they say anything else anywhere to suggest this was simply a mistake? Did they cite three? Did they say in some other document that we made the correct determination? Is there anything other than this misstatement? Your Honor, I don't know as I stand here. What I would urge is that the court focus on the significance of this California decision and its impact on states nationwide. We can't make that determination. That impact exists by operational law under 209E2B. I'm urging the court to look at the national applicability first and foremost, which is the first issue we raised. If you look at the applicability, we don't have anything. I'm sorry, Your Honor? If you lose on applicability, you lose on vision, right? We would not agree, Your Honor. We believe that the intent of Congress is to give EPA the opportunity to designate and publish. The intent of Congress is to be defined in the first instance, in fact, in the final instance, really, by the words in the statute. Congress does not have a final intent. Congress has the intent, the expressed intent of Congress, with which we're concerned. Congress gave explicit instruction as to what the finding had to be to come within three, and EPA didn't make that finding, did it? Very well, Your Honor. Is there any case you can cite where a court, our court or any court, has accepted the proposition that you're now stating, that a determination under subparagraph three can be stated incorrectly and we still accept it? Your Honor, I don't think that the venue question, the interpretation of prong three has come up in this court. Has anyone suggested it? Even in passing, has anyone ever said, if the agency doesn't say national scope in effect and they say applicability, that that's good enough, we understand what they're saying? Your Honor, to my knowledge, no. Is there any way to send this case back to the agency for them to explain what they've done? Or are they stuck with, you didn't use the right language? And is there any hook you have? Because that is an answer sometimes when we don't understand what the agency means to say, but we've got to have some place to look for the confusion to say we're confused and we ought to let the agency explain what they meant to say. Is there any hook? Because the language is wrong. The language is wrong, the intent is clear. How do we know that? There is a published determination, Your Honor. The statute says EPA must publish a finding. So the best you have is that they published something. And so we ought to know because they published something, it's a determination under subsection three. That's the best shot you have to show us there's some confusion? You're right. I regret that I don't have. I'm really not trying to shoot you down. I'm trying to understand, do you have anything that would cause us to think, well, send it back because we're confused about what they're meaning to say? Other than that they publish, EPA publishes a lot of stuff. If the court determines that it does not have, it cannot determine its venue based on this record, the recourse would be to give EPA an opportunity to explain itself. It certainly would not be to transfer venue. Why should it not be to transfer venue? When we have a plain vehicle to have the case decided by a court that would have venue, why would we send it back and delay everybody, cost everybody more money, to make a determination on something we can determine now? We're not saying we're going to throw this rule out. We're going to cut California off, let it float out to sea. All we would be doing is sending the case to a different circuit. Why are you insisting that we should send it back? You can say I didn't, Judge Edwards did. But I don't know, you've got a real problem here. EPA believes strongly that this court is the proper court in the United States. Where does EPA say that? EPA does say that. EPA does have a finding that judicial review may be sought only in the U.S. Court of Appeals for the D.C. Circuit. But that's like saying I'd like it to be heard in the Supreme Court. It's not really a finding, a conclusion of law, it's called a finding. Here's my question. To transfer this case to the Ninth Circuit would be literally unprecedented and would create a situation where you have two different courts of appeals evaluating EPA decisions under the identical section of the Clean Air Act. This contemplates that this circuit and the regional circuits will all have menus on cases. The only question here is which one follows which. There's nothing unprecedented about that. It's not remotely unprecedented. They have to decide which of the two menus it follows. In this area of the statute, Your Honor, respectfully, it would be the first time that we'd be giving another court of appeals the opportunity to opine on a California waiver decision where at least it's arguable, respectfully, that EPA's intention was to have it identified as a determination of nationwide scope or effect. So this is a question of litigation strategy. Even if the people in the EPA couldn't read the statute, people in the Justice Department can read the statute. And you knew at some point that this was going to be a problem, not you personally. But once the challenge got raised, once the motion of transfer, once the problem arose in the Ninth Circuit, I'm not sure there was anything barring the EPA from requesting a remand or even making another finding. Right. Because it only goes to the venue question. It doesn't go to the substance of the waiver question. Why did the government not fix this problem? We are now at the oral argument in the court of appeals after the case in this court of appeals. The case began in the Ninth Circuit, came over here, they held their case. It was brought in both circuits. Why? Is there something about the statute that would have barred you from fixing this a lot earlier? No, Your Honor. And yet the Department of Justice did not perceive this to be the problem the courts identified given the national applicability prong that I've already addressed at some point. Did you not read the brief of the other parties? They identified it as being the problem. I don't understand the state, but we didn't understand it to be a problem. We recognize the argument, Your Honor, but given the national applicability prong between You had the statute that gives scope and effect language. You had the EPA decision that doesn't use the scope and effect language. I cannot understand how you could possibly say you didn't appreciate the nature of the problem. We believe this is an issue the court need not confront. If it determines, as we believe it should, that this is a nationally applicable action, the question of whether the wrong language is a fatal defect is an issue the court need not address. Is there some reason that you couldn't argue? In the brief, you argue both ways. You argue it's nationally applicable, and even if it's not, it's scope and effect. Was there some reason that I'm just not seeing as to why the agency couldn't have said the same thing? Is there some reason the agency couldn't have said the same thing that you're now arguing in your brief? That is, we think this is nationally applicable, although what the agency thinks about nationally applicable is not relevant under the statute. Right. But even if not, we think the scope and effect. Is there some inconsistency between national applicability and scope and effect? There are actions, Your Honor, where EPA has characterized or certainly defended actions in briefs as being both, where there is some ambiguity about whether it fits into one box or another. But EPA has said that that ambiguity does exist from time to time. It's not a binary choice. The agency has acted in a manner here consistent with its past practice, something that's not been challenged. This case has, for better or worse, highlighted the importance to EPA of using the exact phrasing. I dare say that it's important that EPA gets the message that this court is delivering. But in terms of its practice in this case, it's fully consistent with the way it's operated in cases that have not focused on this and where venue from this court has not been challenged. Wait, wait, wait. Those are all cases where it wasn't decided, you mean, where the issue didn't come up? That's right, Your Honor. Wait, wait, wait. I asked you a minute ago, are there cases in which the agency has meant to invoke subsection 3 but didn't use the correct language and we essentially accepted it even though we didn't discuss it? Yes, Your Honor. But refer the court to the American Trucking Association case, which also involves in-use, non-road fleets, where the court affirmed the reasonableness of EPA's decision and the underlying record indicates that there, again, the nationally applicable language was used by EPA. Was it a decision under subsection 3? Exactly the same subsection of the statute. There was no venue challenge. There was no venue challenge. Even on jurisdictional statutes, if we have not construed the question, it's not binding. Venue is certainly waivable. I recognize that it's not been decided squarely by the court to date. Well, venue is waivable, so there's no reason why it would have been. This may be a small, this is a small question. I didn't understand your argument, speaking of venue waiver, that ARTBA had waived its ability to challenge venue here because all it did was intervene in the Ninth Circuit. Your Honor, our point simply is that if the Ninth Circuit was a venue that ARTBA believed was the proper one, it had the opportunity to secure its right to that court by suing. But doesn't it secure, none of the cases are about intervention, and doesn't it secure its right to argue in the Ninth Circuit by intervening in the Ninth Circuit? Your Honor, the court can evaluate the waiver of venue through equitable analysis, and our position is that by making that decision, the court can conclude that ARTBA sat on its rights to have its case heard in the Ninth Circuit. But when you intervene, you have the right to have your arguments heard in that circuit. In fact, we've held that intervention requires standing, Article III standing, essentially because they're acting as a party, possibly with restrictions depending under which rule. But right now, they are essentially a party in the Ninth Circuit. I'm not following where the waiver comes in. If the court views its intervention in that case as being sufficient to get itself into court, then the waiver argument we raise is addressed and answered. Further questions from the court? Okay. Thank you, Your Honor. For the foregoing reasons, we request that EPA's decision be affirmed. Is there time left? Oh, I'm sorry. I apologize. Good morning. Ross Hirsch on behalf of Intervenor Respondent California Air Resources Board. And I'm a little hesitant to even wade into the waters on venue in light of the— Well, you can wade if you're going to time, if you want to. Well, I would. But we didn't brief this issue, so it really isn't our bailiwick. But I would like to just let the court know that California does take the position that even though we're on the other coast, this is the proper venue for waiver decisions to be heard. The way this statute works is like all other Clean Air Act waiver cases, authorization or waiver cases, is that the moment immediately upon this statute being implemented by California, it immediately is nationally applicable for any other state to then join in and adopt the California standards. So it's not so much a matter of— You have to say that statement didn't make a whole lot of sense to me. It's nationally applicable immediately because states could make it applicable. Is that what you're saying? I think applicability refers to really it is available for any other state. At the moment it's approved, any other state can at that point jump in. It's available, but it hasn't been applied. That's true. It hasn't been applied yet, but it can be. So I guess what does applicable mean? It's available, hence applicable, for any other state to join in. That, of course, is exactly what we're struggling with. How do we know what applicable means? I understand. Do you have any help on that? Like I said, this wasn't our issue. We didn't either leave him brief, so I'm not sure. You probably didn't mention it. I mentioned I was a little hesitant, but I would like to use the three minutes or the remainder of the short three minutes I have just to correct a misstatement in Petitioner's Brief that they use as support for their argument that a California off-road diesel standard is not needed. At page 30 of Petitioner's Brief, they state, it is undisputed that there are only two areas in California in nonattainment, namely the South Coast Air Basin and the San Joaquin Valley Air Basin. Now, ARB's briefing and the rulemaking record do highlight these two problematic areas. For ozone, both of them are in extreme nonattainment, and extreme is the highest level of five as far as severity. In fact, they're the only two in the nation designated as extreme. For PM2.5, they're both classified as severe, which, again, is the highest classification and the only two in the nation, I might add. So while it's undisputed, as petitioners do state, that these two air basins are in nonattainment for both ozone and PM2.5, they are in no way the only two basins in California in nonattainment. In California, we have 16 nonattainment areas for ozone. We have seven separate areas nonattainment for PM2.5, and these air basins span multiple counties, multiple air districts. And that's all in the record? Yes, that's all, extensively so, in the record, Your Honor. Can I ask a threshold 8 administrative law question? This argument that they are raising about the San Joaquin Valley, which is raised in their reply brief, was it raised in the rulemaking record? That is, did they say there was no compelling – let's try to get the words here correctly – no compelling and extraordinary conditions except in those two places? You are correct. That was not raised in the rulemaking as far as we could observe in any of the records. The EPA says that they received no comment that addressed the fundamental question. And I believe it on this question. In that case, you don't have to talk anymore about it because we're not allowed to consider it. I would agree with that, and the testimony in the record from counsel clearly specifies what they are raising, and it is not this issue. So that is not something really the court even needs to consider. Further questions? Thank you. Now my question, is there any time left? Okay, you have one minute. Can I ask you about this one point, though? I thought it was an interesting argument in the reply brief about the San Joaquin Valley and the other – there was one other air basin. South something. South Coast. South Coast, yes. But did you make an argument before the agency that there was no compelling need here because those were the only two places that were affected? Absolutely, yes, Your Honor. Can you tell me what page of the – I'm sorry, Your Honor, I don't have the specific page, but we certainly did. You said those were the only places? Yes, we did make an argument at the hearing that there was no compelling and extraordinary need for statewide standards. That's not the same argument. Well, it is the same argument. No, it's not. Well, take it on my assumption because you've got to convince all of us, and I'm one of us. Okay. I'm not buying the broad covering the specific. You made a broad argument. The question is did you raise these specific points about these two places to the agency so that they could have addressed it? Your Honor, we did raise the fact that there is not a compelling and extraordinary need for these California standards in the record. You didn't make the San Joaquin South Coast argument that you put in your reply brief. We did not specifically mention those two areas. We did not specifically mention those two areas. All right, leave the adverb in there and I'll throw it out. Specifically, it was not in the question. Okay. You didn't raise that argument before the EPA did. We did not mention those two areas in the argument before the EPA. I would like to point out, though, that as a substantive matter, regardless of whether EPA in the waiver decision itself is looking at the program standard or the waiver-by-waiver standard suggested by the petitioners, in any event, it only refers to one set of facts to support the waiver decision under either standard, and that one set of facts on the face of the waiver document is that those two areas were non-attainment areas for national ambient air quality standards. But there are at least... Are you saying that's insufficient evidence for the EPA's action? So what? So if they are the only two and they're non-adjacent areas... EPA never addressed why the statewide standards are necessary. So there may be a compelling and extraordinary need as to why these standards are necessary in those two areas cited by the government, but there's no rational connection between the facts found, two out of at least 15 air basins are non-attainment, and the decision made that all 15 air basins should be subject to these regulations because of a compelling and extraordinary need. So that's the question I had, whether you had raised that. And maybe after you leave today, could you submit something, a letter, just saying which pages of the record for the agency we could find an argument that is or approximates the argument that you're making now? In the administrative record? Yes, only in the administrative record, right. Yes, Your Honor, I will do that. Thank you. Are there further questions from the bench? Thank you. We'll take the matter under submission.
judges: Garland, Edwards, Sentelle